UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

CAROLYN MICHAEL,

        Plaintiff,

v.                                      Civil Action No. 2:04-0435

WYETH, LLC, and
PHARMACIA & UPJOHN COMPANY
(n/k/a PHARMACIA & UPJOHN
COMPANY LLC),

        Defendants.


MEMORANDUM OPINION AND ORDER


        Pending is defendants' motion for summary judgment
based on statute of limitations, filed March 28, 2011.


I.  Background


        This is a pharmaceutical products liability action in
which plaintiff Carolyn Michael alleges that she developed breast
cancer as a result of ingesting hormone replacement therapy
("HRT") medications.  The facts recited below are largely
undisputed.  To the extent that a dispute exists, the facts are
stated in the light most favorable to the plaintiff.

A.   HRT Medications and their Potential Link to Breast Cancer

        HRT, as that term is employed here, consists of two
medications: estrogen and progestin.  Estrogen is used to treat

menopausal symptoms such as hot flashes, night sweats, and vaginal atrophy.  Studies published in the late 1970s and early 1980s suggested that prolonged estrogen use could lead to increased risks of endometrial cancer (that is, uterine cancer). Later articles indicated that using progestin together with estrogen could lower this risk significantly.  As a result, physicians in the 1980s began prescribing progestin in combination with estrogen to treat menopausal symptoms.

This action concerns three HRT drugs: Premarin, Prempro, and Provera.  Defendant Wyeth, LLC ("Wyeth") manufactured Premarin, an estrogen drug, and Prempro, a combination estrogen and progestin drug (also known as an "E+P" drug).  Defendant Pharmacia & Upjohn Company ("Upjohn") manufactured Provera, a progestin drug.[1]  The chemical name for Provera is medroxyprogesterone acetate ("MPA").

In the 1990s, the National Institute of Health conducted a clinical trial to evaluate the risks and benefits of Prempro called the Women's Health Initiative ("WHI").  At that time, the WHI study was one of the largest randomized clinical trials evaluating the health of post-menopausal women ever

---

[1]    In a separate summary judgment motion, Upjohn contends that it is not a proper party to this action because plaintiff has not proven that she ingested Provera.  (Doc. No. 149).

conducted.  The Prempro part of the study evaluated more than 16,000 women for more than five years, with approximately half receiving Prempro and the other half receiving placebo pills.

In 2002, three years short of its scheduled deadline, the National Institute of Health terminated the WHI study based upon an unacceptably high occurrence of breast cancer among participants.  The initial results of the study were published in the Journal of the American Medical Association in July 2002.  The study reported a relative risk of breast cancer of 1.24 over a period of 5.6 years of estrogen and progestin use (i.e., the E+P group was 24% more likely to develop breast cancer than the control group).  It also found that the risk of breast cancer decreased after stopping hormone therapy.

The WHI findings were widely covered in the mainstream media.  It was, for example, the subject of TIME Magazine's July 22, 2002 cover story.  See Christine Gorman & Alice Park, The Truth About Hormones, TIME Magazine, July 2002, available at http://www.time.com/time/covers/1101020722/story4.html.  The New York Times reported years later that "[u]se of the treatment plunged after [the WHI] findings were reported."  Study Cites Hormones As Cancer Risk, N.Y. Times, July 14, 2009, at A13, available at http://www.nytimes.com/2009/07/15/health/research/15cancer.html.

B.    Plaintiff's Use of HRT Drugs and Breast Cancer Diagnosis

          According to her deposition testimony, plaintiff
started experiencing menopausal symptoms in the early 1990s.
(Def.'s Reply, Ex. 18, Michael Dep. at 263, 267-68).[2]  She was
approximately 52 years old at the time.  (Id. at 263).  Her
symptoms included irregular periods, hot flashes, mood swings,
insomnia, and excessive perspiration.  (Id. at 268).  In 1994,
Dr. Alexander Wanger prescribed Premarin plus Provera to treat
plaintiff's symptoms.  (Def.'s Mot. Summ. J., Ex. 4, Dr. Wanger
Dep. at 94).  Two years later, in July 1996, Dr. Jane Park
prescribed Premarin plus Provera to plaintiff for the same
reasons as Dr. Wanger.  (Def.'s Mot. Summ. J., Ex. 5, Dr. Park
Dep. at 39-40).  In August 1996, Dr. Park switched plaintiff to
Prempro, (id.), which plaintiff continued taking for some five
years until November 2001.

          During the period that she ingested HRT drugs (1994-
2001), plaintiff received the patient inserts accompanying her
prescriptions.  (Id. at 297-98).  The patient inserts for
defendants' drugs from this time period contained warnings about
breast cancer, (e.g., Def.'s Mot. Summ. J., Ex. 9, 1997 Prempro

---

          [2]    Unless otherwise noted, all citations to plaintiff
Michael's deposition refer to the deposition transcript attached
as Exhibit 18 to defendant's reply brief.

patient insert), which plaintiff asserts were inadequate,[3] (Pl.'s Opp. at 3).  While plaintiff recalls glancing over the insert for at least one of her HRT drugs, she does not remember any of the information contained therein.  (See Michael Dep. at 297-98). She instead relied upon the advice of Dr. Wanger and Dr. Park concerning the risks associated with HRT medications.  (Id. at 297-98, 300).

Dr. Park testified that she had "informed consent discussions" with plaintiff about hormone therapy prior to prescribing her HRT drugs in 1996, but she does not recall the precise details of the discussions.  (Dr. Park Dep. at 39).  As a matter of routine practice, though, Dr. Park discussed the

_____

[3]     The 1997 Prempro insert, for example, states pertinently as follows:

> Cancer of the breast.  Most studies have not shown a higher risk of breast cancer in women who have ever used estrogens.  However, some studies have reported that breast cancer developed more often (up to twice the usual rate) in women who used estrogens for long periods of time (especially more than 10 years), or who used high doses for shorter time periods.  The effects of added progestin on the risk of breast cancer are unknown.  Some studies have reported a somewhat increased risk, even higher than the possible risk associated with estrogens alone.  Others have not.  Regular breast examinations by a health professional and monthly self-examination are recommended for all women.  Regular mammograms are recommended for all women over 50 years of age.

The Premarin and Provera inserts are rather comparable.  See fn. 5, infra.

advantages and disadvantages associated with Prempro –- "the advantages being . . . decreased risk of cardiovascular disease, that there was improvement in bone density, and disadvantages including increased risk of breast cancer, increased risk of endometrial cancer with unopposed therapy, and venous thromboembolic disease."  (Id. at 40).  Dr. Park did not document on her medical chart that she gave a breast cancer warning to plaintiff, but she did write that she discussed the "risks and benefits with her."   (Id. at 97-98).

In October 2001, plaintiff detected a lump in her left breast.  (Michael Dep. at 169, 170).  She was diagnosed with breast cancer in November 2001.  (Id. at 173-174).  Immediately after receiving this diagnosis, plaintiff recalls that either her surgeon or her oncologist told her to stop taking Prempro.  (Id. at 176, 187).  She thereafter underwent a mastectomy of her left breast on November 23, 2001.

Plaintiff learned of the WHI study when its findings were released in July 2002.  (Pl.'s Opp., Ex. 2, Michael Dep. at 141-42).  As she understood it, the WHI investigators found that Prempro created a high risk of breast cancer and urged doctors to discontinue prescribing the drug.  (Id. at 142).  She saw coverage of the study on television and in newspaper articles. (Id. at 142-44).  One article in particular caught the attention

of plaintiff and her husband.  After reading this article,
plaintiff recounted, "It's like a light bulb went off in my head.
I thought, 'Gosh, you know, this could cause my cancer.'"  (Id.
at 144).  It was at this point that she started "really thinking
seriously" about bringing the present lawsuit.  (Id. at 145).

         Plaintiff instituted this action on May 6, 2004,
invoking the court's diversity jurisdiction.[4]  Her fourth amended
complaint asserts four counts against defendants: Count I is for
negligence; Count II is for breach of warranty (express and
implied); Count III is for strict products liability (design
defect); and Count IV is for strict products liability (failure
to warn).  (Fourth Am. Compl. ¶¶ 44-80).  Plaintiff demands
compensatory damages, attorneys fees, pre- and post-judgment
interest, the costs of suit, punitive damages, and equitable
relief.  (Id. at 23).

         Defendants have moved for summary judgment, contending
that plaintiff's claims are time-barred because she filed suit
outside the applicable two year statute of limitations.

---

         [4]    The case was transferred to multidistrict litigation in
the United States District Court for the Eastern District of
Arkansas on July 26, 2004.  Over five years later, on April 13,
2010, it was remanded to this court for the completion of
discovery, pretrial activity, and trial.

## II.  Motion for Summary Judgment

### A.  Governing Standard

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Material facts are those necessary to establish the elements of a party's cause of action.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant.  Id.  The moving party has the burden of showing -- "that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  If the movant satisfies this burden, then the non-movant must set forth specific facts as would be admissible in evidence that demonstrate the existence of a genuine issue of fact for trial.  Id. at 322-23.  A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant.

**8**

Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

A court must neither resolve disputed facts nor weigh the evidence, Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995), nor make determinations of credibility.  Sosebee v. Murphy, 797 F.2d 179, 182 (4th Cir. 1986).  Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor.  Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979).  Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."  United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

B.   Statute of Limitations Analysis

The West Virginia Supreme Court of Appeals has provided a five step analysis for evaluating whether a cause of action is time-barred:

> First, the court should identify the applicable statute
> of limitation for each cause of action.  Second, the
> court (or, if questions of material fact exist, the jury)
> should identify when the requisite elements of the cause
> of action occurred.  Third, the discovery rule should be
> applied to determine when the statute of limitation began
> to run by determining when the plaintiff knew, or by the
> exercise of reasonable diligence should have known, of
> the elements of a possible cause of action, as set forth
> in Syllabus Point 4 of Gaither v. City Hosp., Inc., 199
> W. Va. 706, 487 S.E.2d 901 (1997).  Fourth, if the
> plaintiff is not entitled to the benefit of the discovery

> rule, then determine whether the defendant fraudulently
> concealed facts that prevented the plaintiff from
> discovering or pursuing the cause of action.  Whenever a
> plaintiff is able to show that the defendant fraudulently
> concealed facts which prevented the plaintiff from
> discovering or pursuing the potential cause of action,
> the statute of limitation is tolled.  And fifth, the
> court or the jury should determine if the statute of
> limitation period was arrested by some other tolling
> doctrine.  Only the first step is purely a question of
> law; the resolution of steps two through five will
> generally involve questions of material fact that will
> need to be resolved by the trier of fact.

Syl. Pt. 5, Dunn v. Rockwell, 689 S.E.2d 255 (W. Va. 2009).

The court in Dunn added that steps two through five require the

trial court "to analyze mixed questions of law and fact . . . to

determine 'whether there is . . . [a] genuine issue of fact to be

tried and inquiry concerning the facts is . . . desirable to

clarify the application of the law.'"  Id. at 265 (quoting Syl.

Pt. 3, Aetna Cas. & Sur. Co. v. Federal Ins. Co. of N.Y., 133

S.E.2d 770 (W. Va. 1963)).  The court considers each step of the

Dunn limitations analysis in turn.

### 1.    Applicable Statute of Limitation

         All of plaintiff's claims, being for negligence, strict

products liability, and breach of warranty, are governed by the

two year statute of limitations found in West Virginia Code §

55-2-12(b), which states as follows: "Every personal action for

which no limitation is otherwise prescribed shall be brought . .

. within two years next after the right to bring the same shall

have accrued if it be for damages for personal injuries." Id.;
see Harrison v. Davis, 478 S.E.2d 104, 108 n. 8 (1996) (noting
that personal injury negligence actions are governed by §
55-2-12(b)); Hickman v. Grover, 358 S.E.2d 810, 812 (W. Va. 1987)
(noting that strict liability claims are governed by §
55-2-12(b)); Taylor v. Ford Motor Co., 408 S.E.2d 270 (W. Va.
1991) (holding that § 55-2-12(b)'s two year limitations period
applies to personal injury actions based on breach of express or
implied warranties).

    2.    Claim Accrual and the Discovery Rule

        Step two of the Dunn limitations analysis requires the
court to determine when the requisite elements of plaintiff's
cause of action occurred.  Those elements would have occurred, if
it all, during the course of the HRT regimen prescribed by
plaintiff's physicians.  Step three requires application of the
discovery rule, which provides that the plaintiff's claim accrues
(i.e., the limitations period begins to run) "when the plaintiff
knew, or by the exercise of reasonable diligence should have
known, of the elements of a possible cause of action."  Syl. Pt.
5, Dunn, 689 S.E.2d at 255.  The court expounded upon the
discovery rule in Gaither:

        In tort actions, unless there is a clear statutory
        prohibition to its application, under the discovery rule
        the statute of limitations begins to run when the

11

> plaintiff knows, or by the exercise of reasonable
> diligence, should know (1) that the plaintiff has been
> injured, (2) the identity of the entity who owed the
> plaintiff a duty to act with due care, and who may have
> engaged in conduct that breached that duty, and (3) that
> the conduct of that entity has a causal relation to the
> injury.

Syl. Pt. 4, Gaither v. City Hosp., Inc., 487 S.E.2d 901 (1997).

The court in Dunn added the following clarification regarding the

Gaither standard:

> Under the discovery rule set forth in Syllabus Point 4 of
> Gaither v. City Hosp., Inc., 199 W.Va. 706, 487 S.E.2d
> 901 (1997), whether a plaintiff "knows of" or
> "discovered" a cause of action is an objective test. The
> plaintiff is charged with knowledge of the factual,
> rather than the legal, basis for the action. This
> objective test focuses upon whether a reasonable prudent
> person would have known, or by the exercise of reasonable
> diligence should have known, of the elements of a
> possible cause of action.

Syl. Pt. 4, Dunn, 689 S.E.2d at 255.

The prime issue here is the last step of the discovery

rule inquiry; that is, when did plaintiff know, or by exercise of

reasonable diligence should she have known, that the conduct of

defendants had "a causal relation" to her condition?

Defendants advance a November 2001 accrual date (when

plaintiff was diagnosed with breast cancer), while plaintiff

urges an accrual date of July 2002 (when the WHI findings were

released).  In contending that plaintiff "knew" in November 2001

of the causal relationship between defendants' HRT drugs and her

12

breast cancer, defendants rely primarily on plaintiff's

deposition testimony.  They first highlight the following

exchange regarding plaintiff's discussions with her doctors about

the possible link between HRT drugs and breast cancer:

> Q.   Were you on hormone therapy at the time you were
>      diagnosed with breast cancer?
>
> A.   Yes.
>
> Q.   Were you told to stop taking hormone therapy?
>
> A.   They immediately took me off of it.
>
> Q.   Who is "they"?
>
> A.   It either had to be Dr. Carrier or my oncologist.
>
> Q.   Who's your oncologist?
>
> A.   Dr. Timothy Bowers.
>
> Q.   What, what did they tell you about your hormone
>      therapy?
>                       * * * *
>
> A.   I asked, I asked the doctors if they thought Prempro
>      could've caused my cancer and, in so many words,
>      they didn't know for sure.
>
> Q.   When did you have that conversation?
>
> A.   Well, I know I had it with Dr. Carrier. And I also
>      asked Dr. Bowers. But they're not gonna commit
>      themself, even if they did know.
>
> Q.   You asked Dr. Carrier whether he thinks that hormone
>      therapy caused your breast cancer?
>
> A.   Yes, I did.
>
> Q.   When did you ask him?
>
> A.   Probably after my surgery.

13

Q.    In November of 2001?

A.    Yeah.

Q.    And what did he tell you?

A.    He really didn't give me a clear answer. "We don't
      know," I think he said. "We don't know for sure."

(Michael Dep. 176-77).


        Defendants next cite the following exchange from

plaintiff's deposition:

Q.    Okay.  And you just told me that you knew breast
      cancer was a risk of hormone therapy; correct?

                    * * * *

A.    Yes . . . I knew.  But like I said, the doctor --
      if they stressed it more I wouldn't have went on it
      in the first place . . .

Q.    Is it Dr. Park who told you that breast cancer was
      a risk of hormone therapy?

A.    I'm sure she did.

Q.    When you first went on it in 1994?

A.    I'm sure it was mentioned; yes. But really what got
      me going is in 2002 when that study come out.

Q.    But you had asked Dr. Carrier whether he thought
      hormone therapy caused your breast cancer a year
      earlier; correct, in 2001?

A.    Yeah, I asked him. But they're not gonna give you
      clear answers.

Q.    And you also asked Dr. Bowers in 2001 whether
      hormone therapy caused your breast cancer?

A.    I'm sure I did.

14

Q.   And what did Dr. Bowers tell you?

A.   Like I said, the doctors stick together. They're not
     going to come right out and say that it does cause
     it. But now, if I'd ask them now, since that report
     came out, maybe it'd be a different story.

                          * * * *

Q.   When Dr. Carrier told you to stop taking your
     hormone therapy in 2001 why did he tell you to stop?

A.   He didn't.

Q.   Dr. Carrier didn't tell you to stop?

A.   Yes, he told me to stop, but he didn't give me any
     reason why I should.

Q.   Did you ask him why you should?

A.   At that time I was so upset, maybe I did, maybe I
     didn't. I was going through an awful turmoil at that
     time.

Q.   Did you have an understanding of why you should stop
     taking hormone therapy?

A.   I felt in my mind that's why they took me off of it;
     they must have thought it could have caused it.

(Michael Dep. at 184-88).


        Lastly, defendants highlight an encounter between Dr.
Park and plaintiff that occurred on November 23, 2001.  On that
date, Dr. Park visited plaintiff when she was hospitalized for
her mastectomy, but plaintiff refused to speak to her.
Defendants claim that plaintiff's recollection of this meeting
shows that she believed at that time that the HRT drugs caused
her breast cancer:

                              15

Q.    Are you critical of Dr. Park's decision to prescribe
      hormone therapy to you?

A.    Yes.

Q.    Why are you critical of Dr. Park's decision to
      prescribe hormone therapy?

A     When I had breast cancer, when I had my breast
      removed, she came to the hospital to see me.    I
      couldn't even talk to her.  I was mad at her.  I was
      mad at the world.  I was so mad, because she was my
      doctor, that I just never went back to her.

Q     Why [were] you mad at Dr. Park?

A     It's just a phase you go through.  I hope you all
      never have to go through with breast cancer, cause
      there's different phases you go through.  And you're
      gonna blame somebody.

Q     Why did you blame Dr. Park?

A     Cause she had me on Prempro.

Q     And you knew in 2001 that Prempro could cause breast
      cancer?

A     If she would have stressed that more I would have
      never went on it.

Q     But she told you that hormone therapy, that breast
      cancer was a risk of hormone therapy; correct?

A     Yeah, but they try to push this other stuff on you,
      the benefits from it.  And there again, I had faith
      in her and when I went on it.  But if I had it to do
      over I would [have] never went on it.

(Id. at 289-90).

          Because plaintiff testified that (1) her doctors told

her that breast cancer was a risk of hormone therapy; (2) her

doctors told her to stop taking HRT drugs when she was diagnosed

with breast cancer; (3) she suspected that her doctors "must have thought" that the drugs caused her cancer; and (4) she blamed Dr. Park for prescribing her Prempro; defendants claim that plaintiff must have "known" in November 2001 that HRT drugs caused her breast cancer.  Defendants also stress that because plaintiff's testimony reveals her subjective knowledge of the causal link, the inquiry of whether plaintiff "should have known" of the link through reasonable investigation is irrelevant here.

Plaintiff, on the other hand, urges that her claim accrued when the WHI findings were published in July 2002.  She emphasizes that no doctor told her that her breast cancer was caused by hormone replacement drugs:

> Q.   But . . . you weren't told that the reason you're being taken off this [is] because this hormone replacement drug caused your breast cancer?
>
> A.   No, [Dr. Carrier] never said that.
>
> * * * *
>
> Q.   Between the time that you actually were told by your doctors to go off hormone replacement therapy and the time that you heard about the WHI study, between that time period, did any doctor or did any individual tell you that your breast cancer was caused by hormone replacement drugs?
>
> A.   No.

(Pl.'s Opp., Ex. 2, Michael Dep. at 330-31, 329).  Plaintiff also stated that when she read about the WHI study results, it was "like a light bulb went off in my head. I thought, 'Gosh, you

17

know, this could cause my cancer.'"  (Id. at 144).  While
acknowledging that her doctors may have warned her about the
breast cancer risks associated with HRT drugs in the 1990s, her
testimony indicates that she did not appreciate the magnitude of
that risk.  As she testified, what "really got me going is in
2002 when that study come out."  (Michael Dep. at 187).

        Viewing plaintiff's testimony in the light most
favorable to her, the court finds that genuine issues of fact
exist as to whether plaintiff "knew" of the causal link between
the HRT drugs and her breast cancer in November 2001.  To be
sure, plaintiff's conduct in November 2001 does show that she was
at least inquisitive about the causal link.  She did, for
instance, ask several of her doctors whether such a link existed.
But the doctors gave her only equivocal answers such as "we don't
know for sure."  After hearing these answers, it appears that
plaintiff continued to hold some suspicions about the
relationship between the HRT drugs and her cancer.  Other than
exhibiting anger towards Dr. Park, though, she did little to act
on those suspicions.  It was not until the release of the WHI
findings eight months later in July 2002 that the self-described
"light bulb went off" in plaintiff's head, indicating to her that
HRT drugs caused her breast cancer.  And it was also at this
point that plaintiff first contemplated pursuing a lawsuit

against defendants.  Although conflicting inferences may be drawn from plaintiff's testimony, a reasonable jury could find that plaintiff did not "know" of the causal relationship between HRT drugs and her breast cancer until the WHI results were released in July 2002.  If the jury were to so find, then plaintiff's May 6, 2004 filing date would be deemed timely under the applicable two year statute of limitations.

Setting aside the factual issues raised by plaintiff's deposition testimony, which itself provides a sufficient basis for denying summary judgment, the court notes its skepticism of defendants' contention that plaintiff -- a layperson with no medical training -- had actual knowledge of the causal relationship between HRT drugs and breast cancer in November 2001.  At that time, even the scientific community was unsure whether such a causal relationship existed, an uncertainty that is illustrated by the equivocal answers given by plaintiff's doctors.  Based upon this reasoning, several courts in HRT cases have denied motions for summary judgment on statute of limitations grounds.  See, e.g., Scroggin v. Wyeth (In re Prempro Prods. Liab. Litig.), 586 F.3d 547, 564-65 (8th Cir. 2009) (upholding district court's denial of summary judgment on statute of limitations grounds and concluding that the "assertion that Scroggin would have been aware of the risk through her own due

diligence is also without merit, for it ascribes to Scroggin the duty of being aware of not simply the possibility that her hormone replacement therapy caused her breast cancer, but that a causal connection was probable.  The jury could reasonably conclude that if medical doctors were unsure of the risk, it is highly unlikely that a layperson would be more aware of that risk."); <u>Simon v. Wyeth Pharms., Inc.</u>, 989 A.2d 356, 367 (Pa. Super. Ct. 2009) ("It is entirely unreasonable that a lay person, completely lacking in medical training, would make the logical connection between HRT and breast cancer prior to the release of the WHI study, when three trained medical doctors believed there was no such connection."); <u>Deutsch v. Wyeth, Inc.</u>, No. MID-L998-06 MT (N.J. Super. Ct. June 14, 2007) ("It is . . . entirely unreasonable to require a patient without medical training to make the logical connection between her ingestion of HRT drugs and her breast cancer and possess a reasonable belief that she could sue Wyeth for her injuries before the WHI findings were released to the public.").

Nor is the court persuaded by defendants' arguments that plaintiff must have known of the causal link in light of her doctors' breast cancer warnings and their discontinuation of her HRT regimen once her cancer was discovered.  Rejecting similar assertions in <u>Scroggin</u>, the Eighth Circuit Court of Appeals aptly

concluded as follows:

> Wyeth and Upjohn also contend that Scroggin should have
> known of the breast cancer risk because she received the
> product warnings, she read the warnings, and Dr. Kuperman
> discussed these warnings with her.  Two doctors testified
> that the labels Scroggin would have read did not convey
> a significant risk of breast cancer, and Dr. Kuperman
> thought the labels indicated that the evidence was
> inconclusive.   Thus, Scroggin presented sufficient
> evidence for the jury to find that the warnings were
> inadequate, contradictory, and confusing.
>
> Wyeth and Upjohn also assume knowledge on Scroggin's part
> because Dr. Hagans instructed her to stop taking hormone
> replacement therapy when he diagnosed her with breast
> cancer.   This argument fails, for the Premarin and
> Prempro labels stated that women already known to have
> breast cancer should not use Premarin or Prempro.  The
> label included that instruction because estrogen is
> contraindicated for women with breast cancer, meaning
> that it can exacerbate their existing breast cancer and,
> as Justin Victoria testified, not because it suggests a
> causal connection.

Scroggin, 586 F.3d at 564.

      Here, as in Scroggin, there is record evidence

concerning the inadequacy of defendants' drug labeling.[5]  There

is also testimony, discussed above, showing that plaintiff's

doctors were unsure whether HRT drugs caused breast cancer.

Based on this evidence, a reasonable jury could conclude that

---

      [5]   The alleged inadequacy of defendants' drug labeling is
the subject of Count IV of plaintiff's fourth amended complaint,
which asserts a claim for failure to warn.   (Fourth Am. Compl. ¶¶
73-80).   Furthermore, evidence concerning the inadequacy of
defendants' drug labeling is discussed in two memorandum opinions
and orders in related actions before the court, Hines v. Wyeth,
04-690 and Keffer v. Wyeth, 04-692, wherein the court denies
defendants' motions for partial summary judgment as to the
plaintiffs' breach of implied warranty claims.

plaintiff did not "know" of any causal link inasmuch as defendants' warnings, relayed to plaintiff through her doctors, did not sufficiently describe that link.  The court also agrees with the reasoning of the Eighth Circuit in concluding that the mere discontinuation of plaintiff's HRT regimen was not sufficient to put her on notice that the drugs caused her breast cancer, given that estrogen is contraindicated for women with breast cancer.

### III.  Conclusion

For the foregoing reasons, the court ORDERS that defendants' motion for summary judgment be, and it hereby is, denied.[6]

The Clerk is directed to forward copies of this written opinion and order to all counsel of record.

DATED: May 23, 2011

_____
John T. Copenhaver, Jr.
United States District Judge

---

[6]     The court's disposition obviates the need to address plaintiff's remaining arguments regarding fraudulent concealment and equitable tolling.